# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ ) | |
| IBRAHIM KNIDEL, ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| ) | |
| vs. ) | CIVIL ACTION |
| ) | NO. 14-40079-TSH |
| ) | |
| ) | |
| ) | |
| T.N.Z., INC., NOURIA ENERGY RETAIL, INC., ) | |
| NOURIA ENERGY CORPORATION, and ) | |
| ZIAD EL-NEMR, ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM OF DECISION
### September 26, 2016

**HILLMAN, D. J.**

### Background

Ibrahim Knidel ("Knidel") has filed a Complaint asserting claims against T.N.Z., Inc.

("T.N.Z.") , Nouria Energy Retail, Inc. ("NER"), Nouria Energy Corporation ("NEC"), and Ziad

El-Nemr ("Ziad") alleging federal law claims for violation of: the Family and Medical Leave

Act, 29 U.S.C. §2601 *et seq.* ("FMLA"), Title I of the Americans with Disabilities Act, 42

U.S.C. §12112 ("ADA"), and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA").

Knidel has also asserted corresponding state law claims against the Defendants for violation of:

Mass.Gen. L. ch. 151B, §4 ("Chapter 151B") and the Massachusetts Wage Law ("MWL"),

Mass.Gen.L. ch. 149, §§100 and 148 and. Additionally, Knidel asserts state law claims for

breach of contract and promissory estoppel. Knidel asserts that Defendants violated the FMLA

by interfering with his rights thereunder (by failing to provide lawful notice of those rights and

denying him time off), and by retaliating against him for exercising his rights thereunder. Knidel

also asserts that Defendants discriminated against him in violation of the ADA and Chapter 151B

by terminating his employment and retaliating against him because he associated with a person

with a disability and/or handicap.   Finally, Knidel asserts that Defendants are liable to him for

breach of contract, promissory estoppel, violation of the FLSA and the MWL by failing to give

him required meal breaks, failing to pay him wages to which he was lawfully entitled, and/or

failing to pay him a contractually agreed to wage hike.

This Memorandum of Decision addresses Defendants' Motion for Summary Judgment

(Docket No. 40).   For the reasons set forth below, that motion is *granted* in part, and *denied*, in

part.

## **Standard of Review**

Summary Judgment is appropriate where, "the pleadings, depositions, answers to

interrogatories and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)).

"A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is

one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't. of

Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 153 (1st Cir. 2009).   The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. " 'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.' " *Id.* (citation to quoted case omitted).   " '[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." ' " *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences." *Id.*   (citation to quoted case omitted). " 'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).

## Facts

### Knidel's Personal Background and Employment History with T.N.Z.

Knidel married his wife Ruth Knidel ("Ruth") in 2008. Ruth was born with an autoimmune disease, specifically bacterial rheumatic fever, limiting her ability to walk and leaving her in chronic pain.   In February 2009, Ziad interviewed and hired Knidel as a cashier for T.N.Z.   Knidel started working for T.N.Z. at a rate of pay of $10 per hour. Knidel worked at the Shell gas station on Rt. 20 in Auburn, Massachusetts ("Rt. 20 Shell Station").   Prior to being hired by T.N.Z, Knidel also interviewed with Ziad's father, Fouad El-Nemr ("Fouad"), who

works for NER. Fouad directed the work of employees at the Rt. 20 Shell Station on a daily basis. On or about August 17, 2009, Knidel quit working for T.N.Z..   In July or August 2009, Ziad offered Knidel a raise and fifty dollars for gas if he came back to work for T.N.Z.   Knidel rejected Ziad's offer and started working for Cumberland Farms. Knidel voluntarily terminated his employment with Cumberland Farms on or about June 26, 2010.   He then called either Abdessamad Bayi,("Bayi") the Manager of T.N.Z., or Salah Bekri ("Bekri"), an employee of T.N.Z., and asked if there was an opening at T.N.Z.   Knidel was re-hired as a cashier for T.N.Z. on or about August 10, 2010.   He was paid $9.00 per hour.   On or about April 22, 2012, Knidel's rate of pay was increased to $9.50 per hour and in May 2012, to $10.00 per hour.

From about July 23, 2011 through on or about September 19, 2011, Knidel traveled to Morocco and did not work at T.N.Z. T.N.Z.'s vacation policy is that employees who have worked at the company for one year are entitled to one week of vacation. At the time Knidel traveled to Morocco, he had worked at T.N.Z. for less than a year and therefore, was not eligible for paid vacation and was never promised paid vacation by T.N.Z.   On July 16, 2011, Ann Army, NER's Human Resource Manager ("Army") completed an "Employee Termination Sheet" for Knidel. Army indicated that Knidel "voluntarily quit" as of July 16, 2011 and was subject to rehire. The company listed on the Employee Termination Sheet was "Nouria Energy" and the location of employment was "Route 20 Shell." On September 19, 2011, Army filled out a "New Hire/Update Form" for Knidel which indicated that as of that date, he was rehired as a cashier at "Route 20."   There was no company listed on the New Hire/Update Form.

Knidel recalls that he first told Ziad that his wife was pregnant around April or May 2012. Because of her pre-existing health problems, Ruth had a high-risk pregnancy. She had

4

"vision problems, like brain water" and a machine to "bring water from her brain."   Knidel also recalls telling Ziad that the pregnancy was high risk. Ziad does not remember when or how he learned of Ruth's pregnancy. On one occasion, Ruth called Knidel at work concerned she was in labor. After failed attempts to reach Ziad, Knidel had a co-worker cover his shift. Ziad warned him not to leave work again without first calling him, which made Knidel fear for his job. During the week of October 21 -27, 2012, Knidel took a one-week paid vacation from T.N.Z. Knidel took this vacation to prepare for the birth of his child.   Ziad told Knidel that if he took the week off, he would not give him time off after the child is born.

Ziad made comments to Knidel regarding his taking his wife to doctors' appointments after work, such as "why you always have to go take your wife. My wife go by herself." Knidel did not consider the comments made by Ziad to be discriminatory at the time they were made. Ziad became angry when Knidel took time off to take his wife to medical appointments. Despite scheduling appointments after Knidel's shift ended, Ruth was late for a couple of her appointments and missed 2-3 appointments altogether. Knidel's son was born on December 13, 2012.   Ruth suffered a stroke while delivering the child which significantly limited her ability to move and walk and use her right side; she was required to use a wheelchair. Immediately after childbirth, she was transferred to another hospital (separate from her son) after which she was transferred to Fairlawn Rehabilitation Center.

Knidel worked for T.N.Z. on Saturday, December 15, 2012. He worked that day because when he contacted Bayi three days earlier to take time off when his wife was in labor, Bayi told him he could have two days off, but that he had to work on Saturday (December 15th).   Knidel spoke to Bayi on December 15th and told him that he needed time off.   Bayi told Knidel that he

could have time off. At the time, Knidel asked for days, not months, off of work. On Monday, December 17, 2012, Ziad and Knidel spoke over the phone and Ziad told to Knidel to take whatever time he needed.   Zaid had been informed that there were complications with the birth of Knidel's son. Knidel was never advised, orally or in writing, that he may have been eligible for job protected leave. However, there was a poster at Route 20 Shell Station advising employees of their rights under the FMLA.

In late December 2012 or early January 2013, Bayi called Knidel. During the conversation, Knidel said that he did not know when he was coming back to work, but that he would try to return as soon as his wife came home. Knidel also said that he would keep them apprised of the situation. Thereafter, two similar phone calls took place between Knidel and Bayi, the first occurring either the same week or the following week and the second occurring before Knidel s wife came home from Fairlawn Rehabilitation Center (on January 11, 2013). Knidel could not immediately return to work when Ruth returned home because she required a full-time personal care assistant ("PCA") and at that point, the PCA was only part-time. Approximately one week after Ruth came home, Knidel called Ziad and asked for a letter stating the last day he had worked. Ziad replied that he couldn't give Knidel a letter because they had been calling him and since he never answered the phone, they presumed he quit. Ziad gave him Army's number and said to call her for a letter.

Knidel never came back to work. On January 22, 2013, T.N.Z. changed Knidel's payroll status to voluntary termination.   Knidel applied for unemployment benefits in March or April 2013.   Ziad received a letter regarding Knidel s claim for unemployment benefits. Knidel was considered a good worker and good person by Bayi and a good worker by Ziad.

### Knidel's Wage Complaint

In the Non-Payment of Wage and Workplace Complaint Form submitted to the Massachusetts Attorney General, Knidel claimed that he was owed vacation pay and he indicated there were "meal period violation[s]." Mr. Knidel was re-hired on or about August 10, 2010 and his last day of work was December 15, 2012. Knidel received a total of one week of paid vacation during his employment at T.N.Z. and was not paid for any unused vacation upon or after his separation.   Knidel did not indicate non-payment of wages as a reason for filing the complaint.

### Knidel's MCAD/EEOC Charge

In his discrimination complaint (the "MCAD/EEOC Charge") filed with the Massachusetts   Commission Against Discrimination ("MCAD") and cross-filed with the Equal Employment Opportunity Commission ("EEOC"), Knidel named T.N.Z., Ziad, and NEC as respondents-- he did not name NER, as a respondent. In the MCAD/EEOC Charge, Knidel alleged that "Respondents terminated me because of discriminatory animus directed toward me as a result of my association with my wife and their desire to be free from their obligations under the law, including but not limited to its obligation to provide me with time off under the Family Medical Leave Act."

<u>T.N.Z. and the Nouria Companies</u>[1]

*<u>The Operative Companies</u>*

Ziad's brother, Tony El-Nemr ("Tony"), began operating the Route 20 Shell Station located at 310 Washington Street, Auburn, Massachusetts ("310 Washington") starting in 1989 when he became a franchise dealer for Shell Oil. In 1989, Tony hired Ziad to work at the Route 20 Shell Station. In 1991, the business was renamed T.N.Z. Ziad bought all of the shares of T.N.Z. from Tony and only Ziad currently has ownership interest and control over T.N.Z. Ziad does not recall the year he purchased ownership of T.N.Z. from Tony, does not recall if any paperwork was exchanged to memorialize the transfer (such as a deed of sale) and does not recall whether he payed any money to Tony or Tony gave him the business. He thinks he may have bought it from Tony for $2 or $10, but doesn't remember. According to Tony, he transferred all of his stock in T.N.Z. to Ziad sometime in 2006 and received no payment in return. A stock certificate indicates that Tony transferred 100 shares in T.N.Z. to Ziad on January 4, 2006; 100 shares being all of the issued and outstanding shares. Ziad is currently the President, Treasurer, Secretary, and sole Director of T.N.Z. and has been since about 2005. T.N.Z.'s principal office is located at 310 Washington Street. Ziad is listed as the President, Treasurer, Secretary and Sole Director of TNZ on the 2013 and 2014 Annual Reports filed with the Massachusetts Secretary of State. However, the 2013 Annual Report was signed by Tony as President of TNZ and states the location of TNZ's registered office as 326 Clark Street, Worcester, Massachusetts (the 2014 Annual Report states the location of TNZ's registered office as 310 Washington Street).   On

---

[1]  The "Nouria companies" consist of thirty one separate entities which own and operate hundreds of gas station/convenience stores in New England. The Nouria companies work as a single enterprise with multiple divisions. While the Nouria companies consist of over 30 legal entities, the parties have primarily focused on three of them NER, NEC and Nouria Energy Services, Inc. ("NES").

November 13, 2014, Tony also signed T.N.Z.'s license renewal form and indicated he was a corporate officer of T.N.Z. T.N.Z. has eight employees; it has never had 15 or more employees.

Tony has been the President, Treasurer, Secretary, and sole Director of NEC[2], formerly known as Tony El-Nemr Enterprises Inc., since its incorporation on January 21, 1999. The principal office is located at 326 Clark Street, Worcester, Massachusetts ("326 Clark Street"). Tony is also the President, Treasurer, Secretary, and Sole Director of NER. NER's principal office is also located at 326 Clark Street. NER operates the convenience stores and the retail gasoline locations owned by the Nouria companies. NER pays the wage for the hourly employees at the Nouria companies' retail gasoline locations across Rhode Island, Maine, Massachusetts, and New Hampshire and employs well over 50 employees within a 75 mile radius of the Route 20 Shell Stations. Ziad and T.N.Z. do not currently have ownership of any of the Nouria companies. During periods relevant to this dispute, Ziad had a ten percent ownership interest in two Nouria companies: Nouria Energy, LLC and ABF Realty.   Ziad has never been involved in the operations of NEC or NER. Tony has no ownership interest in T.N.Z. and is not involved in T.N.Z.'s operations.

---

[2]   Defendants have created a great deal of confusion in their material statement of facts by their inconsistent use of defined terms. In their preface to their statement of facts, they define "Nouria Energy Corporation," as "NEC."   However, throughout their statement of facts, they instead refer to NEC as "Nouria Energy Corporation."   Additionally, in the preface Defendants define "Nouria Energy Retail, Inc.," which the Court defines as "NER," as "Nouria Energy." In their statement of facts, they sometimes refer to NER as "Nouria Energy," or "Nouria Energy Retail," and sometimes as "Nouria Energy Retail, Inc." At other times, reference is made simply to "Nouria." Given the similarity between the names and Defendants' inconsistent use of defined terms, it is unclear which entity is actually being referenced. Moreover, throughout its statement of facts, Defendants define other terms *and then don't use the specified definitions.* Any ambiguities created because of Defendants' sloppiness have been resolved against them.

*Corporate Interactions*

Prior to March 30, 2011, T.N.Z. rented the land at 310 Washington Street from Motiva Enterprises LLC pursuant to a retail facility lease. The lease began on September 1, 2009 and expired on August 31, 2012.   Prior to March 30, 2011, T.N.Z. purchased gasoline from NER and was not a dealer for NER.   The land at 310 Washington Street is currently owned by GTY Properties. One of the Nouria companies, it appears to be NEC, currently leases the land at 310 Washington Street from Getty Realty.

On August 1, 2011, NEC and T.N.Z. entered into a Rider-Management Fee Arrangement pursuant to which T.N.Z. leases the land at 310 Washington Street and sells motor fuel owned by NEC. The initial term of the Rider-Management Fee Arrangement was from August 1, 2011 through July 31, 2012 and thereafter, continuing from month to month. NEC and T.N.Z. are also parties to the Management Fee Station Lease, dated December 19, 2014, pursuant to which T.N.Z. leases 310 Washington Street from NEC for a monthly rent of $5,000.   The Management Fee Station Lease states that "[T.N.Z.] is an independent businessman with the exclusive right to direct and control its convenience store business and, where applicable, other business operations at the above premises.   [NEC] reserves no control over said business(es) at the above Premises. [T.N.Z.] has no authority to employ anyone as an employee or agent of [NEC] for any purpose." Additionally NEC and T.N.Z. are parties to a Management Fee Agreement, dated December 19, 2014, pursuant to which T.N.Z. sells petroleum products owned by NEC on a commissioned basis at the rate of five cents per gallon of motor fuel sold. The Management Fee Agreement states that "the means, methods and details are left entirely

to the discretion and judgment of [T.N.Z.] for the purpose and accomplishment of" selling

gasoline and the parties "expressly agreed and stipulated that neither [T.N.Z.] nor the employees

of   [T.N.Z.] shall be deemed or construed to be employees of [NEC]."

*Administrative Overlap*

T.N.Z.'s payroll services are provided by Army, who is employed by NES.   Army enters

the time for T.N.Z. employees into the timesheet and enters new hires, but has no other

administrative responsibilities for payroll or practices. T.N.Z. does not pay Army for her

services.   Army does not provide support services to any other Nouria company.

Ziad uses E-Pay for the payroll company and, like NER, stopped using ADP because E-

Pay is cheaper. Army provides human resources ("HR") support for NES and NER. In 2012,

Army was involved in employee relations, payroll, benefits and any questions having to do with

HR policies or procedures that employees or managers had for NER. Army does not

communicate corporate policy to T.N.Z. employees and does not provide any oversight to ensure

that appropriate training and policies are implemented at T.N.Z. She does not ensure that

employees of T.N.Z. receive a handbook and does not process paperwork related to training,

policies, or handbooks at T.N.Z. Ziad does not consult with her concerning HR issues. Although

Army purportedly has no involvement with T.N.Z., she has at times identified herself as the HR

Manager for T.N.Z. For example, she has filled out employment verification sheets for

Washington Heights Apartments concerning Knidel in which she listed her title as "HR Manager

TNZ" on one occasion, and on another occasion, listed the firm/organization she worked for as

"TNZ, Inc. Nouria Energy." Moreover, on September 19, 2011, she signed the "Manager

Approval" line on New Hire/Update Form for Knidel (this is the form pursuant to which he was

11

"rehired" after his unpaid vacation to Morocco). As described below, when Knidel was hired in August 2010, Army signed Knidel's "New Employee Checklist" as manager. Army has attended unemployment hearings on behalf of NER *and* T.N.Z.

T.N.Z.'s bookkeeping services are provided by Susan Goodwin ("Goodwin"), who is an employee of NER.   Among the services Goodwin provides to T.N.Z. are entering account payable invoices, printing checks, paying bills, entering bank transactions, reconciling the bank account and similar bookkeeping functions. NER has been performing the bookkeeping functions for T.N.Z. since March 10, 2010. Tony is authorized to sign checks for T.N.Z. Tony is the only person other than Ziad that has authority to sign checks for T.N.Z. T.N.Z.'s only checkbook is located at 326 Clark Street and Tony signs most of the checks for T.N.Z. Ziad does not have authority to sign checks on behalf of NER.

Ziad has a "nouriaenergy" e-mail address. T.N.Z.'s lottery account has a "nouriaenergy" e-mail address. T.N.Z.'s payroll records, bank records and time sheets are stored at NER's office at 326 Clark Street. Additionally, as mentioned previously, T.N.Z's business checkbook is located at 326 Clark Street. T.N.Z. and NER do not share employees. However, employees of NER have covered shifts at T.N.Z. and Fouad was at the Route 20 Shell Station on a daily basis when Knidel worked there. Ziad approves new hires for T.N.Z., makes the decision about whether and when to take an employee off of T.N.Z.'s payroll, determines the rate of pay for employees of T.N.Z., and determines whether and when employees of T.N.Z. receive a pay increase. Army has signed T.N.Z. documents which indicate that she has the power to approve T.N.Z. hires, determine rate of pay for T.N.Z. employees and terminate T.N.Z. employees.

*Separation of Business Powers*

T.N.Z. is one of four commissioned dealers for NER.   Tony El-Nemr submitted an affidavit to the Alcoholic Beverages Control Commission stating that "[u]pon approval of the transfer of the [Wine & Malt Package license] and change of manager for TNZ, Inc. with Ziad El Nemr as the new president and manager, I will have no further interest financial or otherwise of any kind in the off premise package store license." On December 15, 2006, the Alcoholic Beverages Control Commission found that Tony and Ziad were credible and that there "is no franchise product, accounting, bank keeping, percentage of fees derived from gross revenue agreements between [T.N.Z.] and any third party, which would trigger further inquiry into whether there was a direct or beneficial interest in said license" by Tony. The Alcoholic Beverages License for 310 Washington Street was held by T.N.Z. for years 2010, 2011, 2012, and 2013.

Ziad does not consult Tony on business matters.   No one from NER assists T.N.Z. with merchandising. T.N.Z. does not share a bank account with NER. Ziad is not authorized to represent himself as provided services to NER. Ziad trained the manager of T.N.Z., Bayi.   Bayi creates the work schedule for employees of T.N.Z. and trains new employees of T.N.Z.   NER does not set the schedules for any of T.N.Z.'s employees or assign job duties to any of T.N.Z.'s employees. NER does not control any policies or procedures of T.N.Z.   For example, NER does not require T.N.Z. to adopt any specific policies or programs NER does not prohibit T.N.Z. from adopting any policies or programs that are different than its own. Other examples of corporate independence between T.N.Z. and the Nouria companies include:

- T.N.Z. is a Licensed Sales Agent for the Massachusetts Lottery.

- T.N.Z.'s tax returns are prepared by Tom Marabella. NER's tax returns are prepared by Bollus Lynch LLP.

- T.N.Z.'s workers compensation insurer is Twin City Fire Insurance Company. NER's workers compensation insurer is Federated Insurance. NER's workers compensation insurance does not cover T.N.Z. and/or 310 Washington Street.

- T.N.Z. and NER do not share landscape services, cleaning services, utility services, or maintenance services.[3]   T.N.Z. does not have a mailbox at 326 Clark Street.[4]

- T.N.Z.'s employee files, are stored at 310 Washington Street. T.N.Z. does not use office space at NER's office at 326 Clark Street.

### *Knidel's Employer*

On August 10, 2010, when he was originally hired, Knidel signed acknowledgments that he received a copy of the NER Handbook, Safety Policy, Dress Code and Grooming Policy, Age Restricted Products policy, and Workplace Harassment policy. On that same date, Knidel also signed an Alcohol and Tobacco Sales Employee Compliance Statement, an Employee Direct Deposit Authorization, and a Uniform Agreement (collectively, the NER application package"). The NER Application package included an FMLA Policy. He also received a New Employment Checklist which indicated that the location of his position was 310 Washington, that his salary was $9.00 per hour (the original $10.00 per hour rate was crossed out), and that his position was a part-time clerk. This form was signed by Army, as manager. On one occasion, Ziad has stated

---

[3] NER negotiates the snow plowing contract, the Route 20 Shell Station uses NER's waste management service, and some utility bills are mailed to and/or paid by NER. However, these facts are indicative of the landlord/tenant relationship between the companies rather than an intercorporate relationship.

[4] Although T.N.Z. does not maintain a mailbox at 326 Clark Street, some corporate documents, such as its worker's compensation insurance statements are mailed to T.N.Z. at 326 Clark Street. Also, some of its Annual Reports since 2010 list 326 Clark Street as T.N.Z.'s registered address.

that he used the Nouria materials when he ran out of T.N.Z.'s separate application package and he forgot to change them to remove NER's name. Ziad has also stated that he gave the NER application package to Knidel by mistake. However, according to Bayi, this is the same NER application package, which was previously given to other employees at the Rt. 20 Shell Station, and as of the date of Bayi's deposition, was still being given to employees.

Knidel was trained by Bekri, Bayi, Zaid and Fouad when he first started working for T.N.Z. in 2009. Knidel was re-trained by Bayi and Mustafa Mahdi when he was re-hired by T.N.Z. in 2010.  Ziad determined Knidel's rate of pay, set Knidel's work schedule in 2009, and gave Knidel directions. Zaid gave Knidel his uniform.   However, the uniform was ordered by Army and paid for through NER's account. If Knidel had questions regarding his schedule or job duties, he asked Ziad. For example, Knidel asked Ziad for authorization to take vacation. Knidel also asked Fouad questions regarding his job duties and got instructions from him. Knidel received his paychecks from Ziad, until he began receiving paychecks via direct deposit in 2011. The direct deposit from filled out by Knidel indicated that his employer was "Nouria Energy." Knidel did not work at any other gas station other than the Rt. 20 Shell Station. Knidel never spoke with or met Army. No manager of NER ever gave Knidel instructions about his job, although he did receive instructions from Fouad. Tony never gave Knidel instructions about his job. However, Tony did call Knidel weekly and instruct him to provide a special report from the lottery machine. He did so from late 2012 into 2013 because he was trying to get the stores to remedy an internal control deficiency.

**Discussion**

Defendants assert that Knidel's FMLA and ADA claims fail because he was not an "eligible employee" and/or T.N.Z. and Ziad were not "covered employers" under the FMLA and ADA (because they did not employ a sufficient number of workers to bring them within these statutes' coverage).   Defendants further assert that even if the Court finds in Knidel's favor on these issues, they are entitled to summary judgment: (1) on his FMLA claim because he failed to establish a violation of the FMLA's technical provisions or that he was terminated in violation of the FMLA; (2) on Knidel's ADA and Chapter 151B claims against NER because he failed to name it in the MCAD/EEOC Charge, and (3) on Knidel's ADA and Chapter 151B claims because he cannot establish that he was discharged or retaliated against because of Defendants' belief regarding Ruth's disability, or because he engaged in protected conduct.   As to Knidel's federal and state wage law claims, Defendants assert they are entitled to summary judgment: (1) on Knidel's claim pursuant to §100 of the MWL because that statute does not provide for a private cause of action; (2) on his claim pursuant to §148 of the MWL because at the time his employment ended, he did not have any unused vacation time; (3) on Knidel's claim for violation of the FLSA for failing to pay him earned vacation pay because there is no cause of action for vacation pay under the minimum wage provision of the FLSA (29 U.S.C. § 2006); (4) on Knidel's breach of contract claim because there was no enforceable contract between the parties: and (5) on Knidel's promissory estoppel claim against Ziad because the alleged promise is too amorphous and as to the other Defendants, because they never made a promise to him.

Knidel does not oppose Defendant's motion with respect to the following claims: (1) his retaliation claim under the ADA and Chapter 151(B)(Counts IV and V); (2) his claim pursuant to

16

§100 of the MWL for failure to provide meal breaks (Count VI); (3) his FLSA claim under the minimum wage provision for failure to provide vacation pay (Count VIII); (4) his breach of contract claim (Count IX); and (5) his promissory estoppel claim (Count X). Accordingly, summary judgment shall enter for the Defendants on these claims. The Court will now address whether there are genuine issues of material fact which warrant denial of summary judgment on his remaining claims.

<u>Knidel's Claims for Violation of the FMLA</u>

The FMLA provides that an "eligible employee" may take reasonable leave up to a maximum of twelve weeks in a twelve month period for their own medical reasons or to care for a family member with a serious medical condition. The employee must be allowed to return to the same or an alternative position with some equivalency. The FMLA also prohibits an employer from retaliating against an employee who exercised his or her statutory rights. *See* 29 U.S.C. § 2615(a). "Thus, an employer cannot regard the taking of FMLA leave as a negative factor in deciding to terminate an employee. But, although an employee who properly takes FMLA leave cannot be discharged for exercising a right provided by the statute, she nevertheless can be discharged for independent reasons." *Henry v. United Bank*, 686 F.3d 50, 55 (1st Cir. 2012)(internal citations omitted).   Interference claims under the FMLA are distinguishable from FMLA discrimination or retaliation claims. An interference claim involves the denial of substantive rights that the FMLA provides for employees, while discrimination and retaliation claims involve violations of FMLA provisions that prohibit specify conduct by employers. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159-60 (1st Cir. 1998).   As to interference claims, "[t]he issue is simply whether the employer provided its employee the entitlements set

forth in the FMLA." *Id.* at 159. Such claims include the denial of substantive rights, as well as

other actions by an employer that prevent or even "deter" employees from exercising their rights.

*Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006).   Knidel is asserting both that

Defendants interfered with his rights under the FMLA and retaliated against him for exercising

rights under the FMLA.

<u>Whether Knidel is covered under the FMLA</u>

The FMLA does not cover every employer and employee. To be considered an "eligible

employee" under the statute, the employee must have worked: (1) for a covered employer for at

least 12 months, (2) worked not less than 1,250 hours during the 12–month period immediately

preceding the date the leave is taken; and (3) at a worksite where the employer employs at least

50 employees within 75 miles as of the date that notice of the need for leave was provided. *See*

29 U.S.C. § 2611(2)(A) and § 2611(2)(B)(ii).   A "covered employer" is "any person engaged in

commerce or in any industry or activity affecting commerce, who employs 50 or more

employees for each working day during each of 20 or more calendar workweeks in the current or

preceding calendar year."   *Engelhardt v. S.P. Richards Co.*, 472 F.3d 1, 4 (1st Cir.2006)(citation

to quoted authority omitted).   Defendants assert that Knidel is not an "eligible employee" and

that T.N.Z. and Ziad are not "covered employers" because T.N.Z./Ziad never employed more

than fifteen people during the course of Knidel's employment.   Knidel does not dispute that

T.N.Z./Ziad did not employ the requisite number of employees.   However, he argues that for

purposes of determining whether he is covered under the FMLA, T.N.Z. and the Nouria

companies should be treated as a single enterprise or joint employer (during the relevant time

period, the Nouria companies employed well over 50 employees within 75 miles of the Route 20

18

Shell Station and well over 50 employees for each working day during each of 20 or more

calendar workweeks in the relevant calendar years).

> Separate entities will be deemed to be parts of a single employer for purposes of
> FMLA if they meet the 'integrated employer' test. Where this test is met, the
> employees of all entities making up the integrated employer will be counted in
> determining employer coverage and employee eligibility. A determination of
> whether or not separate entities are an integrated employer is not determined by
> the application of any single criterion, but rather the entire relationship is to be
> reviewed in its totality. Factors considered in determining whether two or more
> entities are an integrated employer include:

> > (i) Common Management;

> > (ii) Interrelation between operations;

> > (iii) Centralized control of labor relations; and

> > (iv) Common Ownership.

*Id.*, at 4. The four factors are given equal consideration, but the court's "analysis … should be

informed by certain economic concerns. This is because the 50-employee exception is an

economic one rooted in protecting small businesses, and the purpose of the 'integrated employer'

test is to ensure that a defendant has not structured itself to avoid labor laws. *Id.* at 5. The First

Circuit determined that the ultimate issue is whether the larger entity "controls enough facets of

[the smaller entities] business and operations, such that it has not maintained its economic

distinctness." *Id.*

In this case, I find that T.N.Z. is solely owned by Ziad and therefore, the fourth factor

mitigates against a finding of an integrated employer. As to the remaining factors, there are

genuine issues of material fact which cannot be resolved at summary judgment.   For example,

Defendants contend that Ziad makes all hiring, firing and disciplinary decisions and that no one

who works for the Nouria companies has any supervisory authority over employees at the Route

20 Shell Station. Defendants also contend that T.N.Z. employees do not work at any Nouria

company and no Nouria company employee ever works at T.N.Z and that T.N.Z.'s operations

and record keeping are separate and distinct from the Nouria companies. However, there is

evidence that Fouad, an NER employee, works at the Route 20 Shell Station and supervises

T.N.Z. Employees. There is also evidence that an NES employee covers shifts at the Route 20

Shell Station. There is also documentary evidence which on its face, indicates that Army is the

HR manager for T.N.Z. and NER and that she has the authority to hire, terminate and set the

wage rate for T.N.Z. employees. Army has signed documents on behalf of T.N.Z. Moreover,

Army and Goodwin, both NER employees, handle payroll and bookkeeping functions for both

NER and T.N.Z., T.N.Z. employee are given NER employment documents when they are hired.

T.N.Z. uniforms are purchased by NER. Moreover, while Ziad is listed as the sole officer and

director on corporate annual reports filed with the Massachusetts Secretary of State, recent

reports have been signed by Tony as president and list the corporation's registered address is

listed as 326 Clark Street.   While the companies purport to have separate business addresses and

offices, many of T.N.Z.'s business records are kept at 326 Clark Street and some corporate

correspondence and business statements are mailed to 326 Clark Street. T.N.Z.'s corporate

checkbook is located at 326 Clark Street; Tony is an authorized signer on T.N.Z.'s checking

account and signs most of the checks which are issued. These are only a *few* examples of the

financial and operational overlap between T.N.Z. and the Nouria companies (in particular NER).

I am mindful of the First Circuit's admonition that use of an affiliated companies' greater

resources dos not create an inference that the companies are an integrated employer.   As many

courts have recognized, small companies often integrate their operations with a larger

parent/affiliated company for efficiency sake and because it is economically advantageous. Thus, payroll operations, bookkeeping and other services may be shared between the companies, or purchased in an arm's length transaction. Where such integration is done merely to "capitalize on cost efficiencies," and does not involve common management and operations, it does not destroy the distinct economic identity of the companies and will not support a finding that the companies are integrated. On the record before me, however, there are genuine issues of material fact as to whether T.N.Z. and the Nouria companies have common management and operations and whether T.N.Z. has maintained its economic distinction from the Nouria companies. Therefore, I cannot find as a matter of law that T.N.Z. and the Nouria companies are not an integrated employer for purposes of the FMLA.

### *Knidel's Interference Claim*

Knidel assert that Defendants interfered with his rights under the FMLA by both misleading him regarding his rights thereunder and by failing to inform him of his rights. Defendants assert that Knidel's interference claim fails because Knidel is not covered by the FMLA.   I have found that there is a genuine issue of material fact as to whether Knidel is covered under the FMLA and therefore, Defendants motion for summary judgment on this basis is denied.   Defendants also argue that Knidel's interference claim fails because he cannot establish harm, that is, he cannot prove that the failure to give him proper notice left him unable to exercise his rights under the FMLA in a meaningful way. It is clear that there are genuine issues of material fact on this issue and therefore, no further discussion is warranted. Summary judgment is denied.

### *Knidel's Retaliation Claim*

"To make out a *prima facie* case of FMLA retaliation, an employee must show: (1) [he] availed [him]self of a protected FMLA right; (2) [he] was 'adversely affected by an employment decision;' and (3) 'there was a causal connection between [him] protected conduct and the adverse employment action.'" *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 719 (1st Cir. 2014).   Defendants contend that Knidel cannot establish a *prima facie* case because he was not entitled to FMLA leave (because he was not covered by the statute).   I have previously determined that there is a genuine issues of material fact as to whether Knidel was covered under the FMLA and therefore, summary judgment is denied.

### Knidel's Claims for Discrimination under the ADA and Chapter 151B

Knidel asserts that Defendants violated his rights under the ADA and Chapter 151B due to his association with a disabled person, *i.e.*, his wife, Ruth.   Defendants assert that Knidel's claims against NER are barred because he did not name that entity in his MCAD/EEOC Charge. I agree and, therefore, summary judgment shall enter for NER on these claims.   Defendants assert that T.N.Z. and Ziad are entitled to summary judgment on Knidel's ADA claim because T.N.Z. and Ziad are not "employers" for purposes of this statute. In the alternative, Defendants assert that they are entitled to summary judgment on Knidel's ADA and Chapter 151B discrimination claims because, as a matter of law, he has failed to establish a *prima facie* case of associational disability discrimination.

### *Whether T.N.Z. and Ziad are Employers under the ADA*

Under the ADA, an employer is "a person engaged in an industry affecting commerce who has fifteen or more employees ... and any agent of such ... person." 42 U.S.C. §

12111(5)(A).   There is no dispute that T.N.Z./Ziad do not meet the 15 employee threshold to be

an "employer" for purposes of the ADA.   Knidel argues that the Nouria companies and T.N.Z.

are an integrated employer for purposes of the ADA and therefore, he is covered under the ADA.

Defendants argue that for the same reasons they are not an integrated employer under the FMLA,

T.N.Z. and the Nouria companies are not an integrated employer under the ADA. Defendants

have not argued that a different standard applies for determining whether affiliated companies

should be treated as a single integrated employer under the ADA than under the FMLA.   For

that reason, the Court will assume the same four factor test and policy considerations articulated

by the First Circuit in *Engelhardt* apply to determining whether T.N.Z. and the Nouria

companies are an integrated employer for purposes of the ADA.   For the same reasons as found

with respect to Knidel's FMLA claim, I find that there are genuine issues of material fact as to

whether they are an integrated employers for purposes of the ADA.

### *Whether Knidel has stated a Prima Facie Discrimination Claim*

"The term 'associational discrimination' refers to a claim that a plaintiff, although not a

member of a protected class himself or herself, is the victim of discriminatory animus directed

toward a third person who *is* a member of the protected class and with whom the plaintiff

associates.' " *Perez v. Greater New Bedford Vocational Tech. Sch. Dist.*, 988 F. Supp. 2d 105,

110 (D. Mass. 2013)(citation to quoted case omitted).   Such claims may be brought under the

ADA. The Massachusetts Supreme Judicial Court has also recognized that such claims may be

brought under the Chapter 151B where the plaintiff claims to have had an adverse employment

action taken against him because of his association with an immediate family member who is

disabled. To make out such a claim, the plaintiff must establish that the adverse employment

action was taken "*because of* his association with his disabled wife, not merely because he asked for an accommodation on account of her disability that defendant was unwilling to give." *Fenn v. Mansfield Bank*, Civ.Act.No. 14-12554-NMG, 2015 WL 628560, at *3 (D. Mass. Feb. 12, 2015).

To establish a *prima facie* of associational discrimination, Knidel must prove that: (1) he was subjected to an adverse employment action; (2) he was qualified for his job at the time of the adverse employment action; (3) at the time of the adverse employment action, his employer knew of his wife's disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that his wife's disability was a determining factor in the decision to terminate him. Defendants assert that Knidel has failed to make out a *prima facie* case of discrimination because he has failed to establish that he was terminated because of his association with his disabled wife, that is, because his wife's handicap was a determining factor in the decision to terminate him (assuming for purposes of this discussion, that he was terminated). I agree with the Defendants that there is little evidence to support Knidel's assertion that he was terminated him due to his employer's unfounded or stereotypical beliefs regarding Ruth and her disabilities. However, given the comments attributed to Ziad, which I must accept as true for purposes of this discussion, I find that on the record beforeme, there are issues of material fact sufficient to warrant a denial of Defendants' motion for summary judgment.

### *Knidel's Claim for Violation of §148 of the MWL*

Knidel has brought a claim under §148 of the MWL for unused vacation pay he alleges was due him at upon the termination of his employment with T.N.Z. More specifically, Knidel asserts that he was owed one weeks' vacation pay. Defendants assert that they are entitled to

summary judgment on this claim because at the time of his discharge, Knidel had used up all of the vacation time to which he was entitled.

Section § 148 of the MWL  provides that "[a]ny employee discharged  from . . . employment shall be paid in full on the date of his discharge . . . The word 'wages' shall include any holiday or vacation payments due to an employee under an oral or written agreement."   The Massachusetts  Supreme Judicial Court ruled that employers must pay unused, earned vacation time to employees upon discharge. *See Dixon v. City of Malden,* 464 Mass. 446, 450 (2013). The parties dispute the terms of T.N.Z.'s vacation policy (which is unwritten). Consequently, there are genuine issues of material fact as to how much vacation time Knidel had earned at the time of his discharge and whether he was fully compensated for any unused vacation time. For that reason, summary judgment is denied.

### Conclusion

Defendants' Motion for Summary Judgment (Docket No. 40) is ***granted*** in part, and ***denied***, in part, as provided in this Memorandum of Decision.

/s/ Timothy S. Hillman
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**